IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JAMES TIMOTHY COOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:22-cv-00040 |
| ) | |
| ROANOKE ELECTRIC STEEL ) | By: Elizabeth K. Dillon |
| CORPORATION, d/b/a/ STEEL ) | United States District Judge |
| DYNAMICS ROANOKE BAR DIVISION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff James Taylor Cook brought this diversity action[1] against defendant Roanoke Electric Steel Corporation d/b/a/ Steel Dynamics Roanoke Bar Division ("RESCO" or "SDRBD"), asserting claims of retaliation in violation of Virginia Code §§ 40.1-27.3(A)(1) and 40.1-51.2:1 arising from the termination of his employment at defendant's steel mill.

Now before the court is RESCO's motion for summary judgment (Dkt. No. 19). After briefing and oral argument (Dkt. Nos. 18, 21, 23, 26), the matter is now ripe for resolution. For the reasons stated herein, the court will grant the motion.

I. BACKGROUND

SDRBD is a steel mill located in Roanoke City. Cook began work at SDRBD in 2001 and was employed there as a millwright—primarily responsible for maintenance duties around the mill—from approximately 2006 until his termination in April 2021. At the time of his termination, Cook's immediate supervisor was Mike Luck (a Mechanical Maintenance

---

[1] Cook is domiciled in Virginia. Upon the court's order to show cause (Dkt. No. 8) and after conferring with opposing counsel, Cook represented that RESCO is incorporated in Indiana and maintains its principal place of business in Fort Wayne, Indiana. (Dkt. No. 9.)

Supervisor).  Above Luck was Aaron Larson (a Melting & Casting Manager), who reported directly to Jerry Adams (the General Manager and highest-ranking employee at the Roanoke mill).  At the time of Cook's termination, Alicia Grace was the Safety Coordinator (the person responsible for safety compliance, including compliance with statutory safety regulations) at the Roanoke mill; she also reported directly to Adams.  (Deposition of Alicia Grace, Dkt. No. 18-4 ["Grace Dep."], at 10:11–15, 17:6–22.)

To remove dust, fumes vapors, chemicals, and other potentially hazardous contaminants from the furnace and melt shop in the mill, the Roanoke mill maintains a series of fans and ducts that pulls these substances out of those areas and into a "bag house" (located in a separate building from the main plant), where the removed substances are then filtered and eventually hauled off as waste.[2]  To work in certain parts of the bag house (e.g., the area of confined space where the filter bags that collect the contaminants are located), employees are required to wear a respirator under Occupational Safety and Health Administration ("OSHA") and Virginia Department of Labor and Industry ("VDOLI") regulations and must also have received HAZMAT (hazardous materials) training.  But if an employee is working in other areas in the bag house or within 30 yards outside the bag house, he or she is generally not required to wear a respirator or have HAZMAT training.[3]  At the time of Cook's termination, two SDRBD employees—Billy Shifflett and Benjamin Hall—were specifically responsible for working in the

---

[2] Cook argues that the parties disagree as to the precise meaning of the term "bag house" as that term is colloquially understood at the mill—specifically, for example, whether references to the "bag house" by SDRBD employees referred only to the entirely enclosed building or also to areas outside that building.  (See, e.g., Deposition of James Timothy Cook, Dkt. No. 18-1 ["Cook Dep."], at 13:19–14:1, 89:21–90:10.)  But as the court will explain herein, any dispute in that regard is ultimately immaterial to the resolution of RESCO's motion for summary judgment.

[3] The only exceptional circumstance requiring respirators and HAZMAT training outside the confined area would be if there was an "upset condition"—meaning an abnormality, such as dust being released from the vents. No party asserts that there was an upset condition on April 20, 2021 (the date Cook was asked to work in the bag house area).

bag house.  Prior to April 2021, Cook had not worked in the bag house since approximately 2005 or 2006.

On April 20, 2021, after a pre-shift meeting, Luck told Cook that Shifflett needed some help in the bag house area (because Hall was out sick that day) and asked Cook if he could assist.[4]  Cook responded that he did not have HAZMAT training and was not certified to wear a respirator (because those certifications had apparently expired), but that if he "got the okay from the safety coordinator [Grace], then [he] would be more than happy to go do the work." (Cook Dep. 18:6–10, 21:15–21.)  It was Cook's understanding at the time that the Safety Coordinator had the final say on issues of safety protocol at the mill.  (*Id.* 24:4–10.)

As Cook requested, Luck called Grace, and the three met together in Luck's office to discuss the nature and location of the work Cook was asked to perform.[5]  Luck told Grace that Cook felt he was being asked to do a job that was unsafe.  Grace then asked Luck to specifically describe the scope of work he was asking Cook to do.  Luck said he wanted Cook to help Shifflett stage some equipment in preparation for a fan motor change that was supposed to occur

---

[4] There is some disagreement among the parties as to what exactly Luck said to Cook in this conversation. Cook insists that Luck initially asked if he "wanted to go help Billy up *in the bag house*" (Cook Dep. 17:13–16 (emphasis added)) and did not indicate in what specific area the work would be performed or whether respirators or HAZMAT training would be required in that area (*id.* 19:2–4). In response, RESCO points to Cook's responses to several requests for admissions, in which he plainly admitted that he was directed "to help assist another employee stage equipment for an upcoming fan motor change at [RESCO's] premises in Roanoke, Virginia" and that Luck told him this work "was to be performed outside the building where the 'baghouse' is located." (Dkt. No. 18-7 at 4–9, ¶¶ 1–3.) RESCO insists that these answers contradict each other, and that Cook was never directed to work "in the bag house." First, upon drawing all reasonable inferences in Cook's favor, the court is not necessarily convinced that there is a conflict in the testimony. Cook's admissions—which seem to acknowledge what work he was *ultimately* directed to do and where to do it—do not speak to what work he was *initially* directed to do or where to do it. Moreover, regardless of the exact words Luck initially used, Cook's response indicates he understood the request to involve working in a part of the mill that would require use of a respirator and HAZMAT training; whether that understanding was correct or reasonable does not matter here because right after this conversation, Cook's supervisors met with him and clarified that he would be working outside the bag house, shortly before he sent the e-mail that led to his allegedly retaliatory discharge. As a result, any dispute as to what Cook was told to do *before* that meeting is immaterial to the legal issues presented for summary judgment.

[5] At Adams' request, Luck and Grace drafted statements summarizing this meeting. (Dkt. No. 18-7 at 19–23.)

the next day, including such work as taking out nuts and bolts from the duct work leading to a fan located outside the building where the bag house is located. Luck explained to Grace that most of the work would take place *outside* the bag house—not inside. Grace then looked at Cook and asked if that was what he was told. Cook agreed that the work would be outside the building where the bag house was located, but said he remained concerned because he was not respirator fit tested and had not recently been through HAZMAT training. Cook was worried that "any time you take every other bolt out, you're breaking the seal of the ductwork, and some dust could possibly escape . . . and that's supposed to be a contained system." (Cook Dep. 60:12–20.)[6] Grace explained to Cook that Shifflett (who would be working with him) was HAZMAT trained and thus would know what to do if any issues arose, and that because he would be working *outside* the bag house, he did not need to wear a respirator.[7] She further told Cook that if he saw anything that looked abnormal or concerned him, he could call her at any time of the day or night.

Grace then asked if Cook had any additional questions. Cook said he simply felt he needed to "cross his T's and dot his I's" to "make sure he was doing everything correctly" (Grace Dep. 33:9–13) and that he would "send her an e-mail to confirm that we had the conversation" before heading to do the job (Cook Dep. 37:21–23) so he could "CYA in case the company tried to fire him" (Dkt. No. 18-7 at 23). Cook also said that if he saw "any dust at all,

---

[6] Cook also indicated that he has seen other workers wearing respirators while working outside the bag house. (Cook Dep. 91:21–92:6.) Moreover, Brian Woodford, who had worked at RESCO for 22 years before retiring in April 2022 and had "pretty much the same job" as Cook, testified that at times he had seen Shifflett working outside of the bag house with a respirator. (Deposition of Brian Woodford, Dkt. No. 21-5 ["Woodford Dep."] at 6:4–22, 31:11–19.) Woodford further testified that if he was asked to work on an exterior fan, he also "would be concerned about dust." (*Id.* 13:4–11.)

[7] In his deposition, Luck marked, with a circled "X," the location of the work Cook was to perform on an overhead picture of the area. (*See* Deposition of Mike Luck, Dkt. No. 18-3 ["Luck Dep."] at 18:14–19:21; Dkt. No. 18-7 at 45.) Grace identified the same with the number "2" on a landscape photo of the area in her 30(b)(6) deposition. (*See* Dkt. No. 18-7 at 46; Dkt. No. 18-5 ["30(b)(6) Dep."] at 17:10–19:5.)

4

that he was going to take pictures and videos and send them to OSHA." (Grace Dep. 33:18–20.) Luck asked Cook why he had a problem with the job assignment; Cook told Luck that he felt Luck was "bullying him" and that he was not going to talk about it anymore. (Dkt. No. 18-7 at 23.) Cook then left Luck's office.

After the meeting, at 8:18 a.m., Cook sent an e-mail to Grace and copied Larson and Adams. The e-mail stated:

> Alicia
>
> This email is just to confirm that you authorized me to work *in* the bag house today. We have established that I'm not certified to wear a respirator and that I'm not certified in hazmat training. Mike Luck is also aware and sent me to work in that area
>
> Thanks
>
> Tim Cook

(Dkt. No. 18-7 at 10 (emphasis added); Cook Dep. 38:9–24.) Cook testified at his deposition that, although he wasn't sure "when it's appropriate or when it's not appropriate" to copy certain people on e-mails, he felt there was nothing wrong with copying Larson or Adams on this e-mail because they were "in [his] chain of command" and, in Cook's view, "[the] best thing for me to do is just copy everybody in my chain of command, that way everybody is on the same page." (Cook Dep. 42:4–17.) He further testified that although "it's not normal practice" to copy Larson or Adams on e-mails whenever he has a question with his supervisor, he did so on this occasion "[b]ecause safety is a pretty big deal, especially HAZMAT training," and he "wanted to make sure everything was in the proper order and everything was documented" by making Adams aware of the location in which he was instructed to work.[8] (*Id.* 43:1–15.) He knew,

---

[8] Cook alleged in his complaint that he believed he was using the proper chain of command to report his concerns to the best of his knowledge; in March 2021, he had e-mailed Luck requesting that he "please explain the reporting process," to which Luck never responded. (Compl., Dkt. No. 1, at ¶ 19; Dkt. No. 18-7 at 11.) However,

5

though, that accusing Grace and Luck of authorizing him to work inside the bag house without a respirator or HAZMAT training could get them in trouble.  (Cook Dep. 43:1–20.)

At 8:25 a.m., Adams responded to Cook's message, copying the same people:

> Tim,
>
> I am assuming if I am g[e]tting an email regarding this that there is a disagreement.  Let's stop and have a discussion.
>
> Tim my perception is that you believe you are being asked to do something unsafe.  If that is the case I would expect you not to do it.
>
> Let's all have a discussion regarding the details before we proceed.
>
> Please come to my office and we will discuss.
>
> Jerry

(Dkt. No. 18-7 at 15.)  Within a few minutes, at 8:29 a.m., Grace responded:

> Hi Tim,
>
> As discussed, the scope of your work is *outside*, to stage and prep around #2 fan.  Billy Shifflett is haz mat trained and will be with you the entire time.
> According to Mike, there should [be] no exposure to any dust while staging and prepping.
> Should you have any additional concerns, you can reach out to Mike and I at any time.  As mentioned, I am taking half a days vacation but can be reached on my cell phone . . . .
>
> Thanks,
> Alicia

(Dkt. No. 18-7 at 14 (emphasis added).)[9]  Both Luck and Grace testified in their depositions that

---

as Cook admitted in response to a request for admission, this e-mail regarding "the reporting process" related to absences and who to contact regarding leave under the Family and Medical Leave Act ("FMLA"), not the reporting of safety concerns. (Dkt. No. 18-7 at 7 ¶ 13; *id.* at 11.)  Further, the e-mail chain shows that Luck responded to Cook's message with several contacts but never mentioned Adams. (Dkt. No. 18-7 at 11–12.)  Prior to the April 20, 2021 e-mail, Cook had never messaged Adams regarding a work assignment (at his deposition, he could only recall one prior e-mail to Adams in relation to a diversity issue). (Cook Dep. 44:14–45:4.)

[9] At his deposition, Cook testified that there was nothing in Grace's email with which he would disagree.

they were concerned about Cook's e-mail because they believed it did not accurately reflect what he was instructed to do and that authorizing Cook to work in the bag house without HAZMAT training or a respirator could have cost them their jobs.[10]

Around 9:00 a.m., Cook, Grace, and Luck all met in Adams' office to discuss the location where the work was to be performed. (Dkt. No. 18-7 at 5 ¶ 6.) According to Cook, the group "basically discussed . . . what work was going to be required and what certifications were required to do the job. (Cook Dep. 53:20–23.) After the meeting that same day, Adams drafted a statement memorializing what was discussed. (Dkt. No. 18-7 at 17–18; Deposition of Jerry Adams, Dkt. No. 18-2 ["Adams Dep."] at 26:6–13.) The court recounts Adams' synopsis of the meeting, in relevant part, below:

First, Adams asked Luck what the job was that Cook was assigned to do. (Dkt. No. 18-7 at 17.) Luck answered that Cook was to prepare for changing a fan motor located outside the bag house. (*Id.*) Adams asked if this was in an area that required HAZMAT training or a respirator; Luck said no, and Grace agreed. (*Id.*) Adams asked Cook if he was asked to work in the bag house as his e-mail alleged. (*Id.*) Cook said he was not and stated that he was asked to work in an area *outside* the bag house.[11] (*Id.*) When asked why he wrote the e-mail, Cook responded that he wanted this "on record" to Adams, Larson, Grace, and Luck to cover himself

---

(Cook Dep. 51:5–21.)

[10] *See* Grace Dep. 88:19–89:1 ("Well, I just feel like he was trying – Mr. Cook was trying to get me in trouble with my supervisor when I hadn't done anything wrong, and more importantly, he lied in that very first sentence. I know that we've talked about that word 'in,' but I never authorized Mr. Cook to work inside of the baghouse."); Luck Dep. 12:2–16 ("[Cook is] saying 'in the baghouse,' and he was never asked to work in the baghouse; it was outside of the baghouse . . . . We thought that we had this settled, that it was safe for him to go up there and work, and to go up the chain like this, it's kind of – it looks to me like he's trying to get someone in trouble.").

[11] *See also* Dkt. No. 18-7 at 5 ¶ 7 (admission by Cook that he told Adams during the meeting that Luck had asked him to work outside the building where the bag house was located to help stage equipment for an upcoming fan motor change).

7

so he did not get in trouble. (*Id.*) When asked why he thought he would get in trouble considering he was not being asked to work in the bag house or any area requiring a respirator, Cook said he did not trust that things would be handled in the right way; he did not trust leadership because he felt certain leaders terminate people they do not like. (*Id.*) Adams asked Cook when that has occurred from April 2019 to the present, but Cook could not recall. Adams told Cook that he should not be saying things like this that (at least in Adams' view) are not true.[12] (*Id.*) Cook further stated that he did not get along with Luck and that they did not have a good relationship;[13] Luck confirmed that he consistently gets "push back" when assigning Cook tasks that he does not like. (*Id.*) Cook then stated that he was following the chain of command by sending the e-mail; Adams disagreed that sending an e-mail to the supervisor, manager, and general manager at the same time was following the chain of command and then clarified for Cook how he should resolve issues like this in the future. (*Id.* 18.) Adams reiterated his view that, according to everyone at the meeting, Cook was never authorized to work in the bag house as his e-mail had stated. Cook agreed that this was true. (*Id.*) Lastly, Cook expressed that he was concerned about the extra dust that could be stirred up when the doors to the dust control area first opened. (*Id.*) Luck then stated that the doors had already been opened before Cook was going to that area to work. (*Id.*) Adams stated that there should be no concern since the door had already been opened and Cook agreed. (*Id.*)

    At the end of the statement, Adams summarized the meeting as follows:

> Tim wrote and sent an email implying that a supervisor and safety coordinator authorized him to violate a cardinal safety rule when

---

[12] In the statement, Adams claimed to have confirmed that this has not happened since April 2019 because he "ha[s] been engaged in all terminations since that time." (Dkt. No. 18-7 at 17.)

[13] *See also* Dkt. No. 18-7 at 6 ¶¶ 8–9 (admissions by Cook that he told Adams during the meeting that he did not get along with or have a good relationship with Luck, or "words to that effect").

> this was clearly not the case.
>
> Tim (in Alicia's statement) threatened to take pictures and videos and send them to OSHA when there is no evidence that anything close to a violation occurred.
>
> Tim accused Mike Luck of "bullying him" when a thorough investigation revealed this was not the case. Mike assigned him a job and there is no evidence that he was disrespectful in any way.
>
> Tim consistently pushes back when assigned tasks from Mike Luck that he does not like.

(Dkt. No. 18-7 at 18.)

After the meeting, Cook went out to help Shifflett with the requested work. Cook remained on the ground while Shifflett worked from a man lift; Cook testified that he "didn't really do anything, except get [Shifflett] some parts and go to the storeroom warehouse and pick up some stuff. I think I picked up some bug spray for him, because there [were] some bees up there." (Cook Dep. 61:2–24.) During the job, Shifflett was not wearing a respirator, and Cook did not recall seeing dust or anything that caused him concern or to feel unsafe. (*Id.* 62:1–15.)

At Adams' request, Grace and Luck provided statements as part of his investigation of the matter. Adams also interviewed Shifflett and asked him to provide a statement and asked Larson to provide information on Cook's prior work history—which revealed prior behavioral issues at work. Upon gathering this information, Adams forwarded it via e-mail to Christopher Graham, Senior Vice President of Long Products for SDI in Fort Wayne, Indiana, and Adams' superior. Adams recommended that Cook be terminated; although he did not need Graham's approval to terminate Cook, it was Adams' general practice to communicate with Graham on these types of issues. In his e-mail to Graham, Adams expressed his view that Cook "clearly has an adversarial relationship with leadership that hinders our ability to effectively and efficiently do the job." (Dkt. No. 18-7 at 36.) In his deposition, Adams elaborated that he recommended

9

Cook be terminated because "through the investigation it became evident that [Cook] understood that this was not the safety incident that he conveyed" and that "[b]y conveying it the way he did, it put other employees' employment in jeopardy." (Adams Dep. 36:20–37:3.) Moreover, according to Adams, "the documentation that [he] received back [from Shifflett] showed a pattern of this type of behavior, especially in reference to leadership, that all together brought [them] to that decision." (*Id.* 37:12–16.)

In response to Adams' message, Graham agreed with the recommendation to terminate. In Graham's view, Cook had "lied," "schem[ed] to imperil the continued employment of certain coworkers," and caused "[d]isruption of the workplace." (Dkt. No. 18-7 at 36.) At his deposition, Graham insisted that reporting a safety violation was not the reason for Cook's eventual termination; rather, because SDRBD had "explained to him, showed him, had a baghouse person planned to work with him, and we explained all of that, and then he sent emails confirming that he was asked to work inside of the baghouse and that was nonsense," Graham "believe[d] that [Cook] lied in the email, and then that leads me to trust which is as big of an issue in our culture as anything we do." (Deposition of Christopher Graham, Dkt. No. 18-6 ["Graham Dep."] at 29:4–16.)

On April 23, 2021, Cook received a "violation notice" signed by Adams which stated that Cook "falsified [the] communication of a safety incident that put other employee[']s jobs at risk. This will result in termination of employment." (Dkt. No. 18-7 at 16.)

## II. LEGAL STANDARDS

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of

10

informing the district court of the basis for its motion" and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating that a factual dispute is "material" only if it might affect the outcome of the suit under the governing law and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

In determining whether there is a genuine issue for trial, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255. Nevertheless, "permissible inferences must still be within the range of reasonable probability" and "it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations and alteration omitted). Thus, summary judgment is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, where "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and summary judgment should be denied. *Id.* at 489–90.

## III. DISCUSSION

Virginia Code § 40.1-27.3 forbids employers from retaliating against employees who participate in certain protected conduct. Va. Code § 40.1-27.3. Among other things, the provision prohibits retaliation against an employee "[who] in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." *Id.* § 40.1-27.3(A)(1). The statute further authorizes any employee to sue his "employer" and seek an injunction, reinstatement, compensation for lost wages, and reasonable attorney fees and costs." *Id*. § 40.1-27.3(C). "A plaintiff 'need only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Wood v. Bristol Va. Utility Auth.*, No. 1:22CV00018, 2023 WL 2482973, at *7 (W.D. Va. Mar. 13, 2023) (quoting *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)). "A plaintiff is not required to show that the underlying report of unlawfulness was in fact meritorious to prevail." *Id.* (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 355 n.1 (4th Cir. 1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). However, the statute does not "[p]ermit an employee to make statements . . . knowing that they are false or that they are in reckless disregard of the truth . . . ." Va. Code § 40.1-27.3(B)(2).

Similarly, Virginia Code § 40.1-51.2:1 provides that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title for themselves or others." Va. Code § 40.1-51.2:1. "[A] plaintiff proceeding under this statute must prove that his termination 'would not have taken place 'but for' [his] engagement in protected activity.'" *Clark v. Gen. Internal Med. Group, Inc*., No. 1:20-cv-1332, 2021 WL 3669322, at *8 (E.D. Va. Aug. 18, 2021) (quoting 16 Va. Admin. Code 25-

12

60-110(A)). Section 40.1-51.2:2, which immediately follows § 40.1-51.2:1, prescribes an extensive remedial scheme that employees must follow when they believe their employer has discharged or discriminated against them in violation of § 40.1-51.2:1.[14]

As relevant here, §§ 40.1-27.3(A)(1) and 40.1-51.2:1 prohibit essentially the same conduct: terminating an employee because he or she made a safety complaint to a supervisor. The only meaningful difference between the two is that § 40.1-27.3 expressly imposes a good faith requirement, whereas § 40.1-51.2:1 protects "*any* complaint" made by an employee "to his employer or any other person under or related to the safety and health provisions of Title 40.1 of the Code of Virginia." *See* 16 Va. Admin. Code 25-60-110 (emphasis added).

That said, for analogous reasons, Cook has not raised a genuine issue of material fact as to his claims under either statute that would preclude the court from granting summary judgment to RESCO in full. First, as to § 40.1-27.3, Cook's argument regarding his good faith leaves much to be desired. The court does not foreclose the possibility that Cook's initial hesitation to work on the exterior fan without a respirator or HAZMAT training was based on a good-faith concern that he would be exposed to dust. But that was not the activity that caused the adverse employment action here. Rather, it was the content of Cook's follow-up e-mail to Grace (with Luck, Larson, and Adams copied) that led to his termination. Prior to that message, Cook had already met with Luck and Grace to discuss the scope of the requested work, and it is undisputed that the group agreed Cook was only being authorized to work *outside* the building where the

---

[14] RESCO first argues that Cook cannot sustain a cause of action under § 40.1-27.3 because, "as noted by Virginia state and federal courts, Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 provide the exclusive state law remedy for worker complaints regarding alleged safety concerns in the workplace." (Dkt. No. 18 at 16 (citing *Williams v. TMS Int'l, LLC*, No. 3:21cv260 (DJN), 2021 WL 4071868, at *6 (E.D. Va. Sept. 7, 2021); *Bass v. E.I. Dupont de Nemours & Co.*, 28 F. App'x 201, 205 (4th Cir. 2002)).) Because Cook cannot survive summary judgment under either statute, the court assumes, for the sake of its analysis, that a plaintiff may bring both causes of action.

bag house was located. (*See* Dkt. No. 18-7 at 5 ¶¶ 4–5.) It is nearly impossible, then, to square that mutual understanding with Cook's e-mail just a few minutes later, in which he asserted that Grace had "authorized [him] to work *in* the bag house." (*See* Dkt. No. 18-7 at 10 (emphasis added).)

Regardless of whether Cook's interpretation of what constitutes working "in" the bag house differed from that of Grace or Luck (which is the bulk of his argument in opposition to summary judgment), the fact remains that his explicit purpose for sending the e-mail was to confirm the instruction Grace gave him (*see* Cook Dep. 26:9–10 (stating that he sent the e-mail "to confirm that we had the conversation")) and to "CYA in case the company tried to fire him" (Dkt. No. 18-7 at 23), yet his summary of Grace's instruction was flagrantly incorrect. Indeed, Grace responded to correct him by noting that "the scope of your work is *outside*" the bag house (Dkt. No. 18-7 at 14 (emphasis added)), and Cook conceded in his deposition that Grace's e-mail was completely accurate.[15] In other words, Cook has all but admitted that he materially misrepresented the instruction he received from Grace (in a manner that made it seem as though she had asked him to violate core safety protocol) via an e-mail sent to her direct supervisor (and Luck's superior). These circumstances, taken together, directly refute a finding of good faith.

Moreover, even assuming Cook could somehow establish good faith in telling Adams that Luck and Grace asked him to work *inside* the bag house without the necessary safety

---

[15] *See* Cook Dep. 51:10–20 (emphasis added) (discussing Alicia Grace's response e-mail)

| | | |
|---|---|---|
| Q | | That's the e-mail Alicia Grace sent you after your meeting with Alicia Grace, right? |
| A | | Yes. |
| Q | | *Is there anything in the e-mail you don't agree with?* |
| A | | *No.* |
| Q | | Okay. So you don't disagree with anything – I'm sorry. *You don't disagree with anything in the e-mail, right*? |
| A | | *No.* |

precautions (despite already being told and having understood that the work would be *outside* the bag house),[16] both claims nevertheless fail because Cook has not demonstrated any "nexus or connection between the protected activity and the [termination]." *See Crews-Sanchez v. Frito-Lay, Inc.*, No. 6:21-cv-00030, 2022 WL 2792207, at *11 (W.D. Va. July 15, 2022). The record demonstrates that Graham and Adams elected to terminate Cook based on their view, after evaluating the details of the investigation, that Cook had misstated the scope of work he was asked to perform in order to endanger the jobs of his co-workers. That is, it was their belief that Cook had lied in his e-mail to try to get Luck and Grace in trouble—not the protected activity of reporting a perceived safety issue—that led to his firing. Whether Graham and Adams were in fact correct that Cook had lied is of no moment. *See, e.g.*, *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.") (quotation omitted).

The only source of proof Cook raises in his brief to resist RESCO's stated motivation for his firing was one carefully quoted excerpt from Graham's deposition that does not stand for the proposition Cook assigns to it. Specifically, Cook refers to the following testimony by Graham:

> Q  So from your perspective, given your understanding of the situation, did Mr. Cook in any way engage in any sort of misconduct at the workplace?
>
> A  Yes, I think that – that he was asked to do something, part of his job; there is no job description that says that he's not to be asked to do what he was asked to do. He was put the facts in front of him and *he could have decided not to* – to

---

[16] *See* Cook Dep. 39:24–40:4 (discussing his e-mail)

> Q  Okay. So when it says, in the bag house today, that's not correct?
> A  I don't know. Is that a trick question? In or at. It says in. Maybe I should have put at. I'm not sure.

15

> ask to not have to do it and have a further hearing, *but what I read is he's going to take notes to OSHA and very – things that are disruptive to getting the job done* and distractions, so again, we have things where supervisors tell us to do things. It may be a harsh term, but if it is a fair ask and you don't do it, that is insubordination to some degree, so I think that its semantics, but the entirety of the story here is what landed me on, as he said, they had – they have the authority to terminate without me, and so when I – when – we don't take these things lightly, and that is why we try to talk to each other even though Jerry [Adams] has the authority. If you notice, he has not represented much in the emails, but I recommend that *my reading of the situation was that it was a terminable offense.*

(Graham Dep. 20:4–21:3 (emphasis added); Dkt. No. 21 at 12 (quoting same).) The insinuation Cook asks the court to accept is that a reasonable jury could conclude—based solely upon this portion of Graham's testimony—that RESCO terminated Cook in retaliation for his expressed intent to make notes related to OSHA matters, despite extensive contemporaneous documentation to the contrary.[17] But a cursory review of the testimony immediately following the quoted portion squarely contradicts Cook's argument:

> Q   It may be in the email, but sitting here today, were you ever made aware that at any time Mr. Cook had indicated that he might take pictures or other sort of like video evidence of things that he considered to be an OSHA violation?
>
> A   I thought that I saw that mentioned in the book.
>
> Q   *Is that problematic to you in any way?*
>
> A   *No.* There is nothing to hide there. It's not – it's not – you know, you either do it or you don't, meaning that if there is documentation, if there is something there, then we want to know about it. *It has nothing to do with my recommendation.*

---

[17] For example, Adams told Cook that he was terminated for lying about a safety issue, and his violation notice says the same. (*See* Dkt. No. 18-7 at 16 (stating that Cook "falsified [a] communication of a safety incident that put other employee[']s jobs at risk").)

16

(Graham Dep. 21:4–17 (emphasis added).)[18]

Cook cannot challenge RESCO's stated reason for terminating him simply by "citing to select lines of deposition testimony taken out of context." *Mack v. S.C. Dep't of Transp.*, C/A No. 3:12–2960–MGL–KDW, 2015 WL 1297836, at *16 (D.S.C. Jan. 28, 2015) (citing *Atkins v. Holder*, 529 F. App'x 318, 320 (4th Cir. 2013)). Moreover, the fact that Cook may have communicated this apparent lie about the scope of his work in the context of protected activity does not, in and of itself, create a nexus between the protected activity and his termination. *See, e.g.*, *Crews-Sanchez*, 2022 WL 2792207, at *12 (granting summary judgment to Frito-Lay after finding that it had terminated the plaintiff "not for engaging in protected activity, but for disclosing confidential information about company employees to persons outside the company without permission, and in any event, then misrepresenting the circumstances underlying the event to her superiors or, at best, showing them a lack of candor regarding the same"); *Clark*, 2021 WL 3669322, at *1–5, *9 (explaining that, where the plaintiff had complained about a lack of N95 protective masks or other PPE in an "unprofessional" and "belligerent" manner by repeatedly "raising his voice" to superiors and interrupting ongoing meetings, that although his conduct "may amount to protected activity . . . , *the manner in which* he engaged in this activity is not protected") (emphasis in original).

Absent more, Cook has failed to raise a genuine dispute of material fact as to whether there is a nexus between his termination and the reporting of a perceived safety violation. As a result, RESCO is entitled to summary judgment on both counts.

---

[18] To boot, shortly thereafter, plaintiff's counsel asked Graham if a hypothetical employee would be doing anything wrong if he or she reported up the chain of command regarding a concern about the operability of smoke detectors, even if the company eventually discovers that the smoke detectors worked just fine. Graham answered: "*No*; *in fact, they would be recognized in our safety system as a good catch, a good safety catch*, and that is sent around the company, and if it is not, if they are functional, then great, we checked and they are functional." (Graham Dep. 22:3–23 (emphasis added).)

## IV. CONCLUSION

For the foregoing reasons, RESCO's motion for summary judgment (Dkt. No. 19) will be granted in full. The court will issue an appropriate order.

Entered: April 24, 2023.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge